# EXHIBIT B

# THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
## TYLER DIVISION

| | | |
|---|---|---|
| IMPLICIT, LLC, | § | |
| | § | |
| v. | § | CASE NO. 6:17-CV-182-JRG |
| | § | LEAD CASE |
| HUAWEI TECHNOLOGIES USA, INC., | § | |
| et al., | § | |

## CLAIM CONSTRUCTION
## MEMORANDUM OPINION AND ORDER

Before the Court is Plaintiff Implicit, LLC's ("Plaintiff's or "Implicit's") Opening Claim

Construction Brief (Dkt. No. 76). Also before the Court is Defendant Palo Alto Networks, Inc.'s

("Defendant's or "PAN's") Responsive Claim Construction Brief (Dkt. No. 78) and Plaintiffs'

reply (Dkt. No. 81).

The Court held a claim construction hearing on February 23, 2018.

## Table of Contents

I. BACKGROUND ........................................................................................................... 2

II. LEGAL PRINCIPLES ................................................................................................ 3

III. AGREED TERMS ..................................................................................................... 8

IV. DISPUTED TERMS .................................................................................................. 9

   A. "message" ............................................................................................................. 9

   B. "process/processing . . . packets" ...................................................................... 15

   C. "state information" .............................................................................................. 16

   D. "key [value]" ....................................................................................................... 23

   E. "removing [an / the resulting] outermost header" ........................................... 24

   F. "resource" ........................................................................................................... 29

V. CONCLUSION ......................................................................................................... 30

## I. BACKGROUND

Plaintiff brings suit alleging infringement of patents that the parties have classified into two groups: the "Demultiplexing Patents" (United States Patents No. 8,694,683 ("the '683 Patent"), 9,270,790 ("the '790 Patent"), and 9,591,104 ("the '104 Patent")); and the "Applet Patent" (United States Patent No. 9,325,740 ("the '740 Patent")). (*See* Dkt. No. 76, Exs. 1–4; *see also* Dkt. No. 76, at 2–4; Dkt. No. 78, at 1–2 & 19.)

The '683 Patent, for example, titled "Method and System for Data Demultiplexing," issued on April 8, 2014, and bears an earliest priority date of December 29, 1999.  Plaintiff submits that this group of patents relates to "processing messages, comprised of packets, flowing through a network."  (Dkt. No. 76, at 2.)  The '790 Patent is a continuation of the '683 Patent.  The '104 Patent, in turn, is a continuation of the '790 Patent.  Plaintiff submits that all three of these patents share a common specification.  (*Id.*)  The Abstract of the '683 Patent states:

> A method and system for demultiplexing packets of a message is provided.  The demultiplexing system receives packets of a message, identifies a sequence of message handlers for processing the message, identifies state information associated with the message for each message handler, and invokes the message handlers passing the message and the associated state information.  The system identifies the message handlers based on the initial data type of the message and a target data type.  The identified message handlers effect the conversion of the data to the target data type through various intermediate data types.

The '740 Patent, titled "Application Server for Delivering Applets to Client Computing Devices in a Distributed Environment," issued on April 26, 2016, and bears an earliest priority date of March 18, 1998.  Plaintiff submits that the '740 Patent relates to "generation and deployment of resources to a client machine at the direction of a server machine, based on a request by the client machine."  (Dkt. No. 76, at 4.)  The Abstract of the '740 Patent states:

> An applet server accepts requests for applets from client computers.  A request specifies the format in which an applet is to be delivered to the requesting client computer.  The applet server has a cache used to store applets for distribution to

client computers.  If the specified form of the requested applet is available in the cache, the applet server transmits the applet to the requesting client.  If the applet is not available in the cache, the server will attempt to build the applet from local resources (program code modules and compilers) and transformer programs (verifiers and optimizers).  If the applet server is able to build the requested applet, it will transmit the applet to the requesting client computer.  If the applet server is unable to build the requested applet, it will pass the request to another applet server on the network for fulfillment of the request.

The Court previously construed terms in the '683 Patent, the '790 Patent, and the '740 Patent in *Implicit, LLC v. Trend Micro, Inc.*, No. 6:16-CV-80, Dkt. No. 115, 2017 WL 1190373 (E.D. Tex. Mar. 29, 2017) (Gilstrap, J.) ("*Trend Micro*").  The '683 Patent has also been the subject of claim construction in the Northern District of California in *Implicit Networks, Inc. v. F5 Networks, Inc.*, No. 3:14-CV-2856, Dkt. No. 57, 2015 WL 2194627 (N.D. Cal. May 6, 2015) (Illston, J.) ("*F5 Networks II*").  Further, the Northern District of California has also construed terms in a related patent, United States Patent No. 6,629,163 ("the '163 Patent")[1] in *Implicit Networks, Inc. v. F5 Networks, Inc.*, No. 3:10-CV-3365, Dkt. No. 93, 2012 WL 669861 (N.D. Cal. Feb. 29, 2012) (Illston, J.) ("*F5 Networks I*").

## II.  LEGAL PRINCIPLES

It is understood that "[a] claim in a patent provides the metes and bounds of the right which the patent confers on the patentee to exclude others from making, using or selling the protected invention."  *Burke, Inc. v. Bruno Indep. Living Aids, Inc.*, 183 F.3d 1334, 1340 (Fed. Cir. 1999).  Claim construction is clearly an issue of law for the court to decide.  *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 970–71 (Fed. Cir. 1995) (en banc), *aff'd*, 517 U.S. 370 (1996).

---

[1] The Demultiplexing Patents all resulted from continuations of the '163 Patent.

"In some cases, however, the district court will need to look beyond the patent's intrinsic evidence and to consult extrinsic evidence in order to understand, for example, the background science or the meaning of a term in the relevant art during the relevant time period." *Teva Pharms. USA, Inc. v. Sandoz, Inc.*, 135 S. Ct. 831, 841 (2015) (citation omitted). "In cases where those subsidiary facts are in dispute, courts will need to make subsidiary factual findings about that extrinsic evidence. These are the 'evidentiary underpinnings' of claim construction that we discussed in *Markman*, and this subsidiary factfinding must be reviewed for clear error on appeal." *Id.* (citing 517 U.S. 370).

To ascertain the meaning of claims, courts look to three primary sources: the claims, the specification, and the prosecution history. *Markman*, 52 F.3d at 979. The specification must contain a written description of the invention that enables one of ordinary skill in the art to make and use the invention. *Id.* A patent's claims must be read in view of the specification, of which they are a part. *Id.* For claim construction purposes, the description may act as a sort of dictionary, which explains the invention and may define terms used in the claims. *Id.* "One purpose for examining the specification is to determine if the patentee has limited the scope of the claims." *Watts v. XL Sys., Inc.*, 232 F.3d 877, 882 (Fed. Cir. 2000).

Nonetheless, it is the function of the claims, not the specification, to set forth the limits of the patentee's invention. Otherwise, there would be no need for claims. *SRI Int'l v. Matsushita Elec. Corp.*, 775 F.2d 1107, 1121 (Fed. Cir. 1985) (en banc). The patentee is free to be his own lexicographer, but any special definition given to a word must be clearly set forth in the specification. *Intellicall, Inc. v. Phonometrics, Inc.*, 952 F.2d 1384, 1388 (Fed. Cir. 1992). Although the specification may indicate that certain embodiments are preferred, particular embodiments appearing in the specification will not be read into the claims when the claim

language is broader than the embodiments. *Electro Med. Sys., S.A. v. Cooper Life Sciences, Inc.*, 34 F.3d 1048, 1054 (Fed. Cir. 1994).

This Court's claim construction analysis is substantially guided by the Federal Circuit's decision in *Phillips v. AWH Corporation*, 415 F.3d 1303 (Fed. Cir. 2005) (en banc). In *Phillips*, the court set forth several guideposts that courts should follow when construing claims. In particular, the court reiterated that "the claims of a patent define the invention to which the patentee is entitled the right to exclude." *Id.* at 1312 (quoting *Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1115 (Fed. Cir. 2004)). To that end, the words used in a claim are generally given their ordinary and customary meaning. *Id.* The ordinary and customary meaning of a claim term "is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention, i.e., as of the effective filing date of the patent application." *Id.* at 1313. This principle of patent law flows naturally from the recognition that inventors are usually persons who are skilled in the field of the invention and that patents are addressed to, and intended to be read by, others skilled in the particular art. *Id.*

Despite the importance of claim terms, *Phillips* made clear that "the person of ordinary skill in the art is deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification." *Id.* Although the claims themselves may provide guidance as to the meaning of particular terms, those terms are part of "a fully integrated written instrument." *Id.* at 1315 (quoting *Markman*, 52 F.3d at 978). Thus, the *Phillips* court emphasized the specification as being the primary basis for construing the claims. *Id.* at 1314–17. As the Supreme Court stated long ago, "in case of doubt or ambiguity it is proper in all cases to refer back to the descriptive portions of the specification to aid in solving the doubt or in ascertaining the true intent and

meaning of the language employed in the claims." *Bates v. Coe*, 98 U.S. 31, 38 (1878). In

addressing the role of the specification, the *Phillips* court quoted with approval its earlier

observations from *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1250 (Fed. Cir.

1998):

> Ultimately, the interpretation to be given a term can only be determined and
> confirmed with a full understanding of what the inventors actually invented and
> intended to envelop with the claim. The construction that stays true to the claim
> language and most naturally aligns with the patent's description of the invention
> will be, in the end, the correct construction.

*Phillips*, 415 F.3d at 1316. Consequently, *Phillips* emphasized the important role the

specification plays in the claim construction process.

The prosecution history also continues to play an important role in claim interpretation.

Like the specification, the prosecution history helps to demonstrate how the inventor and the

United States Patent and Trademark Office ("PTO") understood the patent. *Id.* at 1317. Because

the file history, however, "represents an ongoing negotiation between the PTO and the

applicant," it may lack the clarity of the specification and thus be less useful in claim

construction proceedings. *Id.* Nevertheless, the prosecution history is intrinsic evidence that is

relevant to the determination of how the inventor understood the invention and whether the

inventor limited the invention during prosecution by narrowing the scope of the claims. *Id.*; *see*

*Microsoft Corp. v. Multi-Tech Sys., Inc.*, 357 F.3d 1340, 1350 (Fed. Cir. 2004) (noting that "a

patentee's statements during prosecution, whether relied on by the examiner or not, are relevant

to claim interpretation").

*Phillips* rejected any claim construction approach that sacrificed the intrinsic record in

favor of extrinsic evidence, such as dictionary definitions or expert testimony. The *en banc* court

condemned the suggestion made by *Texas Digital Systems, Inc. v. Telegenix, Inc.*, 308 F.3d 1193

(Fed. Cir. 2002), that a court should discern the ordinary meaning of the claim terms (through dictionaries or otherwise) before resorting to the specification for certain limited purposes. *Phillips*, 415 F.3d at 1319–24. According to *Phillips*, reliance on dictionary definitions at the expense of the specification had the effect of "focus[ing] the inquiry on the abstract meaning of words rather than on the meaning of claim terms within the context of the patent." *Id.* at 1321. *Phillips* emphasized that the patent system is based on the proposition that the claims cover only the invented subject matter. *Id.*

Phillips does not preclude all uses of dictionaries in claim construction proceedings. Instead, the court assigned dictionaries a role subordinate to the intrinsic record. In doing so, the court emphasized that claim construction issues are not resolved by any magic formula. The court did not impose any particular sequence of steps for a court to follow when it considers disputed claim language. *Id.* at 1323–25. Rather, *Phillips* held that a court must attach the appropriate weight to the intrinsic sources offered in support of a proposed claim construction, bearing in mind the general rule that the claims measure the scope of the patent grant.

In general, prior claim construction proceedings involving the same patents-in-suit are "entitled to reasoned deference under the broad principals of *stare decisis* and the goals articulated by the Supreme Court in *Markman*, even though *stare decisis* may not be applicable *per se*." *Maurice Mitchell Innovations, LP v. Intel Corp.*, No. 2:04-CV-450, 2006 WL 1751779, at *4 (E.D. Tex. June 21, 2006) (Davis, J.); *see TQP Development, LLC v. Intuit Inc.*, No. 2:12-CV-180, 2014 WL 2810016, at *6 (E.D. Tex. June 20, 2014) (Bryson, J.) ("[P]revious claim constructions in cases involving the same patent are entitled to substantial weight, and the Court has determined that it will not depart from those constructions absent a strong reason for doing so."); *see also Teva*, 135 S. Ct. at 839–40 ("prior cases will sometimes be binding because of

issue preclusion and sometimes will serve as persuasive authority") (citation omitted); *Finisar Corp. v. DirecTV Grp., Inc.*, 523 F.3d 1323, 1329 (Fed. Cir. 2008) (noting "the importance of uniformity in the treatment of a given patent") (quoting *Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 390 (1996)).

## III. AGREED TERMS

In their December 22, 2017 Joint Claim Construction Chart and Prehearing Statement (Dkt. No. 73, at 1) and their February 22, 2018 Second Amended Joint Claim Construction Chart (Dkt. No. 94, Ex. A), the parties set forth agreements as to the following terms in the patents-in-suit:

| Term | Agreement |
|------|-----------|
| "sequence of [two or more] routines"<br><br>('683 Patent, Claims 1, 4, 24;<br>'790 Patent, Claims 1, 8, 10, 12, 15;<br>'104 Patent, Claims 1, 3, 10, 13, 16) | "an ordered arrangement of [two or more] software routines that was not identified (i.e., configured) prior to receiving a first packet of the message" |
| "application"<br><br>('740 Patent, Claim 11) | "program designed to assist in the performance of a specific task" |
| "source code"<br><br>('740 Patent, Claims 1, 12, 13, 19, 20) | "code in the form of a higher level language such as C, C++, Java, Visual Basic, ActiveX, Fortran, and Modula" |
| "transformation operation"<br><br>('740 Patent, Claims 1, 16, 19, 20) | "operation that modifies code" |
| "fix"<br><br>('740 Patent, Claim 20) | "for" |

## IV.  DISPUTED TERMS

### A.  "message"

| Plaintiff's Proposed Construction | Defendant's Proposed Construction |
| --- | --- |
| "a collection of data that is related in some way, such as a stream of video or audio data or an email message" | "a collection of *application* data that is related in some way, such as a stream of video or audio data or an email message" |

(Dkt. No. 73, Ex. A, at 1; Dkt. No. 76, at 5; Dkt. No. 78, at 2 (emphasis Defendant's); Dkt. No. 94, Ex. A, at 5.)  The parties submit that this term appears in Claims 1, 24, and 25 of the '683 Patent, Claims 1, 8, 13, and 15 of the '790 Patent, and Claims 1, 10, and 16 of the '104 Patent.  (Dkt. No. 73, Ex. A, at 1; Dkt. No. 76, at 5; Dkt. No. 78, at 2; Dkt. No. 94, Ex. A, at 5–9.)

In *Trend Micro*, the parties in that case agreed that "message" in the '683 Patent and the '790 Patent means "a collection of data that is related in some way, such as a stream of video or audio data or an email message."  *Trend Micro* at 12.

### (1)  The Parties' Positions

Plaintiff argues that Defendant's proposal of requiring "application" data should be rejected because the patentee set forth a clear lexicography that controls the meaning of the term "message."  (Dkt. No. 76, at 6.)  Alternatively, Plaintiff urges that the plain meaning of "message" is not limited to "application" data."  (*Id.*, at 6–7.)

Defendant responds that its proposal of "application" data is necessary because, in the *Trend Micro* case, "Implicit appeared to stretch the construction so that it could argue that TCP handshake packets used to establish a connection between two devices are part of a 'message.'"  (Dkt. No. 78, at 2–3.)  Defendant urges that "a 'message' is the data that is of interest to the users of the claimed invention . . . ."  (*Id.*, at 3.)  Defendant argues that "[t]he specification (to which

Implicit concedes we must look) repeatedly and exclusively discloses the invention as being directed to user data." (*Id.*, at 4.)

Plaintiff replies that the patentee's lexicography is unambiguous and "[t]his ends the inquiry." (Dkt. No. 81, at 1.) As to the stated definition itself, Plaintiff argues that "there is simply no ambiguity as to whether the words explicitly used by the patentee are limited to application data—they are not." (*Id.*, at 2.) Further, Plaintiff submits that "as a matter of plain English, the use of an exemplary list, introduced by 'such as,' does not limit the scope of the broader category preceding it." (*Id.*)

(2)  Analysis

Claim 1 of the '683 Patent, for example, recites (emphasis added):

1.  A first apparatus for receiving data from a second apparatus, the first apparatus comprising:
        a processing unit; and
        a memory storing instructions executable by the processing unit to:
                create, based on an identification of information in a
                    received packet of a *message*, a path that includes
                    one or more data structures that indicate a sequence
                    of routines for processing packets in the *message*;
                store the created path; and
                process subsequent packets in the *message* using the
                    sequence of routines indicated in the stored path,
                    wherein the sequence includes a routine that is used
                    to execute a Transmission Control Protocol (TCP)
                    to convert one or more packets having a TCP
                    format into a different format.

Defendant has not shown that anything in this claim language requires limiting "message" to "*application* data." Further, Plaintiff submits that the specification sets forth a lexicography that defines the term "message."

"The patentee's lexicography must, of course, appear with reasonable clarity, deliberateness, and precision before it can affect the claim." *Renishaw*, 158 F.3d at 1249

(citation and internal quotation marks omitted); *see Intellicall*, 952 F.2d at 1388; *Thorner v. Sony Computer Entm't Am. LLC*, 669 F.3d 1362, 1365 (Fed. Cir. 2012) ("To act as its own lexicographer, a patentee must clearly set forth a definition of the disputed claim term other than its plain and ordinary meaning.") (citation and internal quotation marks omitted).

Here, the specification discloses:

> A method and system for converting a message that may contain multiple packets from an [*sic*] source format into a target format. When a packet of a message is received, the conversion system in one embodiment searches for and identifies a sequence of conversion routines (or more generally message handlers) for processing the packets of the message by comparing the input and output formats of the conversion routines. *(A message is a collection of data that is related in some way, such as* [*a*]$^2$ *stream of video or audio data or an email message.)* The identified sequence of conversion routines is used to convert the message from the source format to the target format using various intermediate formats.

'683 Patent at 2:42–53 (emphasis added). This statement, which appears near the beginning of the Detailed Description section of the specification, sets forth a definition of "message" with "reasonable clarity, deliberateness, and precision" so as to be a lexicography. *Renishaw*, 158 F.3d at 1249.

Defendant argues, however, that its proposal of "*application* data" is consistent with the specification as a whole. At the February 23, 2018 hearing, Defendant urged that the remainder of the specification is still relevant even in the presence of a lexicography. *See Renishaw*, 158 F.3d at 1250 ("Ultimately, the interpretation to be given a term can only be determined and confirmed with a full understanding of what the inventors actually invented and intended to envelop with the claim.").

---

[2] The parties appear to have agreed upon this insertion of the word "a" before "stream." (*See* Dkt. No. 76, at 6 & n.2; *see also* Dkt. No. 78, at 3.)

- 11 -

As a threshold matter, Plaintiff does not appear to contest that the above-reproduced examples of "[a] stream of video or audio data or an email message" refer to application data. But these examples are just that, examples, as is evident from their being introduced by the phrase "such as."

The remaining issue, then, is whether Defendant has presented sufficient indications, particularly in the intrinsic evidence, to warrant interpreting the above-reproduced lexicography so as to limit the term "message" to "application data." Several of the claims refer to "application layer," "application layer protocols," "application-level protocols," and "application-level routines," but none of these recitals of "application" appears to be relevant to the meaning of "message." *See* '683 Patent at Cls. 12, 15, 26 & 27; *see also* '790 Patent at Cls. 3, 4, 10, 18 & 19; '104 Patent at Cls. 3 & 13.

Defendant has also cited disclosure of an example in which various format conversions may be necessary to communicate data stored in a bitmap format:

> [W]hen data is generated on one computer system and is transmitted to another computer system to be displayed, the data may be converted in many different intermediate formats before it is eventually displayed. For example, the generating computer system may initially store the data in a bitmap format. To send the data to another computer system, the computer system may first compress the bitmap data and then encrypt the compressed data. The computer system may then convert that compressed data into a TCP format and then into an IP format. The IP formatted data may be converted into a transmission format, such as an ethernet format. The data in the transmission format is then sent to a receiving computer system. The receiving computer system would need to perform each of these conversions in reverse order to convert the data in the bitmap format. In addition, the receiving computer system may need to convert the bitmap data into a format that is appropriate for rendering on output device.

'683 Patent at 1:27–44. This disclosure, however, does not refer to "application" data and does not expressly address the meaning of the term "message."

- 12 -

Defendant has also cited disclosure regarding "multiple messages with different source and target formats":

> The conversion system stores the identified sequence so that the sequence can be quickly found (without searching) when the next packet in the message is received. When subsequent packets of the message are received, the conversion system identifies the sequence and queues the packets for pressing [*sic*] by the sequence. Because the conversion system receives multiple messages with different source and target formats and identifies a sequence of conversion routines for each message, the conversion systems [*sic*] effectively "demultiplexes" the messages. That is, the conversion system demultiplexes the messages by receiving the message, identifying the sequence of conversion routines, and controlling the processing of each message by the identified sequence.

*Id.* at 2:55–3:1. Defendant has not shown how this disclosure regarding various different source and target formats, and processing "the next packet in the message" by the "identified sequence," necessarily shows that a "message" is "application" data.

As to extrinsic evidence, Defendant has submitted a technical dictionary definition of "message" as meaning "a logical grouping of information at the Application Layer (Layer 7) of the OSI Reference Model." (Dkt. No. 78, Ex. B, *Novell's Dictionary of Networking* 360 (1997).) On one hand, "[b]ecause dictionaries, and especially technical dictionaries, endeavor to collect the accepted meanings of terms used in various fields of science and technology, those resources have been properly recognized as among the many tools that can assist the court in determining the meaning of particular terminology to those of skill in the art of the invention." *Phillips*, 415 F.3d at 1318.

On the other hand, this extrinsic evidence is necessarily of somewhat limited weight. *See id.* at 1322 ("[T]he authors of dictionaries or treatises may simplify ideas to communicate them most effectively to the public and may thus choose a meaning that is not pertinent to the understanding of particular claim language."). Also, whereas this extrinsic definition of

"message" appears to be specific to "Layer 7" of the "OSI Reference Model," the intrinsic evidence contains no indication that this particular definition is appropriate as to the claimed invention. *See id.* at 1321 ("heavy reliance on the dictionary divorced from the intrinsic evidence risks transforming the meaning of the claim term to the artisan into the meaning of the term in the abstract, out of its particular context, which is the specification").

On balance, Defendant has failed to demonstrate that the patentee's above-noted lexicography should be modified or that any evidence otherwise warrants limiting the data to "application" data. Indeed, the word "application" does not appear in the written description in any relevant context.

Defendant has urged that the construction should be limited to "application" data because, in the *Trend Micro* litigation, Plaintiff attempted to read the term "message" so as to include "handshake" packets that contain no application data. (*See* Dkt. No. 78, at 2–3 & 5.) Defendant reiterated this argument at the February 23, 2018 hearing, arguing that because the specification discloses that all packets of a message are processed using the same particular sequence, and because handshake packets are necessarily processed differently than application data packets, handshake packets cannot be part of a "message." Yet, Defendant's argument appears to bear upon other claim language rather than on the meaning of the term "message." For example, above-reproduced Claim 1 of the '683 Patent recites: "process subsequent packets in the message using the sequence of routines indicated in the stored path."[3]

Thus, any dispute in this regard would appear to present questions of fact for the finder of fact regarding infringement rather than necessarily any question of law for claim construction.

---

[3] Claims 24 and 25 of the '683 Patent and Claims 1, 10, and 16 of the '104 Patent contain similar recitals.

*See Acumed LLC v. Stryker Corp.*, 483 F.3d 800, 806 (Fed. Cir. 2007) ("The resolution of some

line-drawing problems . . . is properly left to the trier of fact.") (citing *PPG Indus. v. Guardian*

*Indus. Corp.*, 156 F.3d 1351, 1355 (Fed. Cir. 1998) ("after the court has defined the claim with

whatever specificity and precision is warranted by the language of the claim and the evidence

bearing on the proper construction, the task of determining whether the construed claim reads on

the accused product is for the finder of fact")); *see also Eon Corp. IP Holdings v. Silver Spring*

*Networks*, 815 F.3d 1314, 1318–19 (Fed. Cir. 2016) (citing *PPG*).[4]

The Court therefore hereby construes **"message"** to mean **"a collection of data that is**

**related in some way, such as a stream of video or audio data or an email message."**

## B. "process/processing . . . packets"

| Plaintiff's Proposed Construction | Defendant's Proposed Construction |
| --- | --- |
| "apply/applying one or more routines to packets"<br><br>Alternatively:<br>    "apply/applying one or more routines to a packet, where at least one such routine is a conversion routine" | "apply/applying one or more *conversion* routines to a packet" |

---

[4] *F5 Networks I* reached the same conclusions as to the related '163 Patent:

> In the specification, plaintiff defined message as: "a collection of data that is related in some way, such as a stream of video or audio data or an email message." '163 Patent Col. 2:45–47. The question here is whether, in light of the examples given in that definition (*e.g.*, stream of video or email message), the definition of message should be restricted to data in a particular format, as defendants contend. The Court finds it should not reach that question on claim constriction. Message, itself, has been clearly defined in the specification. Whether any particular form of data transmission falls within the express definition of message is a question for the trier of fact. Therefore, message[s] is construed as "a collection of data that is related in some way, such as a stream of video or audio data or an email message."

*F5 Networks I* at 12–13 (emphasis omitted; square brackets in original).

(Dkt. No. 73, Ex. A, at 4; Dkt. No. 76, at 7; Dkt. No. 78, at 5 (emphasis Defendant's); Dkt. No. 81, at 3.)  The parties submit that these terms appear in Claims 1 and 24 of the '683 Patent, Claims 1, 8, and 15 of the '790 Patent, and Claims 1, 3, 10, and 16 of the '104 Patent.  (Dkt. No. 73, Ex. A, at 4; Dkt. No. 76, at 7; Dkt. No. 78, at 2; Dkt. No. 94, Ex. A, at 10–14.)

In *Trend Micro*, the Court construed "processing packets" to mean "applying one or more routines to packets" and construed "process . . . packets" to mean "apply one or more routines to packets." *Trend Micro* at 22.

After the close of briefing in the present case, the parties reached agreement that these terms should be construed to mean "apply/applying one or more routines to a packet, where at least one such routine is a conversion routine."  (Dkt. No. 94, Ex. A, at 10.)

In accordance with this agreement between the parties, the Court hereby construes **"process/processing . . . packets"** to mean **"apply/applying one or more routines to a packet, where at least one such routine is a conversion routine."**

## C.  "state information"

| Plaintiff's Proposed Construction | Defendant's Proposed Construction |
|---|---|
| Plain and ordinary meaning | "information specific to a software routine for a specific message that is not information related to an overall path" |

(Dkt. No. 73, Ex. A, at 5; Dkt. No. 76, at 9; Dkt. No. 78, at 8; Dkt. No. 94, Ex. A, at 14.)  The parties submit that this term appears in Claims 1, 10, and 16 of the '104 Patent.  (Dkt. No. 73, Ex. A, at 5; Dkt. No. 76, at 9; Dkt. No. 78, at 8; Dkt. No. 94, Ex. A, at 14–15.)

### (1)  The Parties' Positions

Plaintiff argues that this term is "clear on its face" and that Defendant's proposal to import various limitations should be rejected.  (Dkt. No. 76, at 9.)  Plaintiff argues, for example,

that "the Demultiplexing Patents make clear that 'the conversion routines' (plural) 'may need to retain state information.'" (*Id.* (citing '683 Patent at 3:1–2).) Plaintiff concludes that "[b]ecause 'state information' means no more than information about the state of the computer, the Court need not construe this term further." (Dkt. No. 76, at 10.)

Defendant responds that its proposal is consistent with findings in the Northern District of California as to related United States Patents No. 6,629,163 ("the '163 Patent") and 7,711,857 ("the '857 Patent"). (Dkt. No. 78, at 8.) Defendant also argues that "the specification explains that 'state information' is specific to a software routine for a specific message." (*Id.* (citing '683 Patent at 3:1–9).) Further, Defendant cites a reexamination of the '163 Patent as well as the prosecution history of the '857 Patent. (Dkt. No. 78, at 8–9.) Finally, Defendant argues that the claims and the specification "explicitly tie 'state information' to specific software routines associated with a message, and not to a computer generally." (*Id.*, at 11.)

Plaintiff replies that the cited prosecution history of the '857 Patent does not apply to the claims of the '104 Patent. (Dkt. No. 81, at 4 (citing *Regents of Univ. of Minn. v. AGA Med. Corp.*, 717 F.3d 929, 943 (Fed. Cir. 2013) ("In general, a prosecution disclaimer will only apply to a subsequent patent if that patent contains the same claim limitation as its predecessor."); citing *Advanced Cardiovascular Sys., Inc. v. Medtronic, Inc.*, 265 F.3d 1294, 1305 (Fed. Cir. 2001)).) As to the reexamination of the '163 Patent, Plaintiff argues that 'how state information is stored does not address whether other components may be permitted to access this data." (Dkt. No. 81, at 5–6.) Similarly, Plaintiff argues that "nowhere does [the specification] say that this information must be used by *only one* message." (*Id.*, at 6.)

(2)  Analysis

*F5 Networks I* construed this term to mean "information specific to a software routine for a specific message that is not information related to an overall path."  *F5 Networks I* at 14.  Also, *F5 Networks I* noted that "[t]he parties agree[d] that state information is information specific to a software routine (component) for a specific message."  *F5 Networks I* at 13 (emphasis omitted).[5]

Claim 1 of the '104 Patent, for example, recites (emphasis added):

> 1.  An apparatus, comprising:
>     a processing unit; and
>     a memory storing instructions executable by the processing unit to:
>         receive one or more packets of a message;
>         determine a key value using information in the one or more packets;
>         identify, using the key value, a sequence of two or more routines, wherein the sequence includes a routine that is used to execute a Transmission Control Protocol (TCP) to process packets having a TCP format;
>         create a path that includes one or more data structures that indicate the identified sequence of two or more routines, wherein the path is usable to store *state information* associated with the message; and
>         process subsequent packets in the message using the sequence of two or more routines indicated in the path.

Defendant's proposal of referring to "a specific message" is thus consistent with the recital in this claim, as well as in Claims 10 and 16 of the '104 Patent, of "state information *associated with the message*."[6]  Plaintiff has argued that Defendant's proposed construction would render this claim language superfluous (Dkt. No. 81, at 6), but to whatever extent this

---

[5] In *F5 Networks I*, Plaintiff's predecessor-in-interest proposed that "state information" be construed as: "Information specific to a component for a specific message."  *F5 Networks I* at 13.

[6] Claim 11 of the '683 Patent, cited by Plaintiff, likewise recites (emphasis added): "The medium of claim 10, wherein one or more of the sessions specify state information for one or more of the conversion routines, and wherein the state information is *specific to the message*."

might be perceived as redundancy in these claims, redundancy in a construction is not prohibited.

*See 01 Communique Lab., Inc. v. LogMeIn, Inc.*, 687 F.3d 1292, 1296 (Fed. Cir. 2012) ("we

have not discovered[] any authority for the proposition that construction of a particular claim

term may not incorporate claim language circumscribing the meaning of the term").[7]

> Also, the specification discloses:

> [S]ince the conversion routines may need to *retain state information between the*
> *receipt of one packet of a message and the next packet of that message*, the
> conversion system maintains state information as an instance or session of the
> conversion routine.

'683 Patent at 3:1–5 (emphasis added). The specification thus refers to "state information" in the

context of a particular message.

> As to Defendant's proposal that state information "is not information related to an overall

path," Defendant has emphasized the patentee's statements during a reexamination of the related

'163 Patent. Defendant has likewise cited reliance thereupon by the Northern District of

California in *F5 Networks I* when construing the term "state information" in the '163 Patent as

well as in the related '857 Patent. *See F5 Networks I* at 13–14. The patentee argued as follows

regarding the "Mosberger" reference:[8]

> Moreover, the Office Action appears to misinterpret the operation of threads in
> Mosberger. The Office Action states at page 6 that the inherency refers to "stored
> information related to the path (emphasis added)." In contrast, claim 1 recites
> retrieving state information "relating to performing the processing of the
> component with the previous packet of the message" as well as "storing state
> information relating to the processing of the component with the packet for use
> when processing the next packet of the message." Thus, claim 1 is directed to a
> method in which state information for a specific component is stored on a

---

[7] To the extent relevant, this principle appears to be particularly applicable because, as noted, all
three of the claims at issue recite "state information associated with the message."

[8] *F5 Networks I* and *F5 Networks II* identified the "Mosberger" reference as: "David Mosberger,
'Scout: A Path-Based Operating System,' Doctoral Dissertation Submitted to the University of
Arizona." *F5 Networks I* at 3; *F5 Networks II* at 3; s*ee F5 Networks II* at 5–9.

component-by-component basis and *is not information related to an overall path*, as the Office Action describes Mosberger.  Accordingly, Mosberger cannot anticipate claim 1.

(Dkt. No. 78, Ex. E, Amendment and Response to Office Action Mailed July 7, 2009, at 24 (emphasis added).)[9]  Plaintiff repeatedly emphasized at the February 23, 2018 hearing that the '163 Patent reexamination involved different claims than are at issue here in the '104 Patent.  Nonetheless, because the term "state information" is similarly used in the context of a particular message in Claims 1, 10, and 16 of the '104 Patent, these statements by the patentee during reexamination of the '163 Patent are applicable.[10]  Also, the claims of the '163 Patent did not

---

[9] Defendant similarly submits evidence that the patentee presented a comparable argument in an examiner interview during reexamination.  (*Id.*, Ex. F, '163 Reexam Examiner Interview Presentation, at 2 ("The system stores state information related to each component in the path; the state information is stored to enable the processing of additional packets of the same message.").)

[10] The parties have cited *Regents of the University of Minnesota*, 717 F.3d at 943 (alterations in original):

> We have explained that "[w]hen the purported disclaimers [made during prosecution] are directed to specific claim terms that have been omitted or materially altered in subsequent applications (rather than to the invention itself), those disclaimers do not apply."  *Saunders Grp., Inc. v. Comfortrac, Inc.*, 492 F.3d 1326, 1333 (Fed. Cir. 2007).  In general, a prosecution disclaimer will only apply to a subsequent patent if that patent contains the same claim limitation as its predecessor.  *See, e.g., Ventana Med. Sys. v. Biogenex Labs., Inc.*, 473 F.3d 1173, 1182 (Fed. Cir. 2006) ("[P]rosecution disclaimer generally does not apply when the claim term in the descendent patent uses different language."); *Invitrogen Corp. v. Clontech Labs., Inc.*, 429 F.3d 1052, 1078 (Fed. Cir. 2005) ("[T]he prosecution of one claim term in a parent application will generally not limit different claim language in a continuation application."); *ResQNet.com, Inc. v. Lansa, Inc.*, 346 F.3d 1374, 1383 (Fed. Cir. 2003) ("Prosecution history is irrelevant to the meaning of [a] limitation [if] the two patents do not share the same claim language."); *Biogen, Inc. v. Berlex Labs., Inc.*, 318 F.3d 1132, 1141 (Fed. Cir. 2003) ("When the applicant is seeking different claims in a divisional application, estoppel generally does not arise from the prosecution of the parent.").

recite any "not information related to an overall path" limitation upon which the patentee could have purportedly been relying in the above-reproduced passage. (*See* Dkt. No. 78, Ex. G, '163 Patent.)

As to Defendant's proposal that "state information" is "specific to a software routine," Defendant has emphasized the patentee's statements during prosecution of the related '857 Patent. The '857 Patent resulted from continuations of the '163 Patent and, as noted above, the Demultiplexing Patents likewise resulted from continuations of the '163 Patent. The '857 Patent thus shares a common ancestry with the Demultiplexing Patents. *See Microsoft*, 357 F.3d at 1349 ("the prosecution history of one patent is relevant to an understanding of the scope of a common term in a second patent stemming from the same parent application"). During prosecution of the related '857 Patent, the patentee set forth a "Brief Description of the Present Invention" as follows:

> In contrast [to the "Taylor" reference, United States Patent No. 6,785,730], the present disclosure is directed to a process for demultiplexing multiple messages and processing the multiple messages by various components within the system. The specification states . . . that:
>
>> since the conversion routines may need to retain state information between the receipt of one packet of a message and the next packet of that message, the conversion system maintains state information as an instance or session of the conversion routine.[] The conversion system routes all packets for a message through the same session of each conversion routine so that the same state or instance information can be used by all packets of the message.
>
> Thus, *the term "state" as used in the present application is not the operational state of a state machine, but the identification of an instance or session of a conversion routine.* When processing multiple messages, each instantiation of a conversion routine has its own state information . . . .

---

Thus, our cases establish that the two patents must have the same or closely related claim limitation language. If the language of the later limitation is significantly different, the disclaimer will not apply.

(Dkt. No. 78, Ex. D, Amendment, at 10 (emphasis added).)[11]  This statement is consistent with Defendant's proposal that "state information" is information regarding a particular routine.

Plaintiff has argued that "nowhere does [the specification] require that the state information *may not* be retained between messages, or between software routines" (Dkt. No. 76, at 10) or "prohibit the accessing of that information by other conversion routines" (Dkt. No. 81, at 5), but no such limitation is apparent in Defendant's proposed construction.

Finally, Plaintiff has argued that the prosecution history as to the '857 Patent does not apply to the '104 Patent because the '104 Patent contains different claim language.  Plaintiff emphasizes that the above-noted "Brief Description of the Present Invention" appears under a heading of "Rejection of Claims 1–25."  (Dkt. No. 81, at 4.)  Yet, the above-reproduced prosecution history refers to "the term 'state' as used *in the present application*."  (Dkt. No. 78, Ex. D, Amendment, at 10 (emphasis added).)  Also significant, this statement appears immediately following a statement about "the present disclosure" and a block quote of what "[t]he specification states."  *Id.*  As noted above, both the '857 Patent and the '104 Patent resulted from continuations of the '163 Patent.  Because the '857 Patent and the '104 Patent thus share a common specification, the language quoted in the above-reproduced prosecution history also appears in the '104 Patent.  '104 Patent at 3:7–14.  This prosecution history is therefore applicable here.

Thus, Defendant's proposal is consistent with the prosecution history and has not been shown to be inconsistent with the specification.  *See Microsoft*, 357 F.3d at 1349; *see also Omega Eng'g Inc. v. Raytek Corp.*, 334 F.3d 1314, 1334 (Fed. Cir. 2003) ("unless otherwise

---

[11] The Amendment as submitted as Exhibit D does not bear a filing date, but the Amendment states that it was "[i]n response to the Office Action dated June 24, 2009."  (*Id.*, at 2.)

compelled . . . the same claim term in the same patent or related patents carries the same construed meaning"). The construction by the Northern District of California in *F5 Networks I* also carries some persuasive weight. *See TQP Development*, 2014 WL 2810016, at *6; *see also Teva*, 135 S. Ct. at 839–40; *Finisar*, 523 F.3d at 1329 (citing *Markman*, 517 U.S. at 390).

The Court therefore hereby construes **"state information"** to mean **"information specific to a software routine for a specific message that is not information related to an overall path."**

**D. "key [value]"**

| Plaintiff's Proposed Construction | Defendant's Proposed Construction |
|---|---|
| Plain and ordinary meaning<br><br>Alternatively:<br>    "information that can be used to identify the session of a protocol" | "information that identifies the session of a protocol"<br><br>And, the "key [value]" must be determined in recited sequence of the claim |

(Dkt. No. 73, Ex. A, at 6; Dkt. No. 76, at 10; Dkt. No. 78, at 12; Dkt. No. 81, at 7–8.) The parties submit that these terms appear in Claims 1, 2, 15, and 16 of the '790 Patent and Claims 1, 10, and 16 of the '104 Patent. (Dkt. No. 73, Ex. A, at 6; Dkt. No. 76, at 10; Dkt. No. 78, at 12; Dkt. No. 94, Ex. A, at 15–18.)

After the close of briefing, the parties reached agreement that these terms should be construed as follows: "information that can be used to identify the session of a protocol"; and "[a]s used in the '104 patent, the determine/determining operation/step is performed before the identify/identifying operation/step." (Dkt. No. 94, Ex. A, at 10.)

In accordance with this agreement between the parties, the Court hereby construes **"key [value]"** to mean: **"information that can be used to identify the session of a protocol. As**

used in the '104 patent, the determine/determining operation/step is performed before the identify/identifying operation/step."

**E. "removing [an / the resulting] outermost header"**

| Plaintiff's Proposed Construction | Defendant's Proposed Construction |
|---|---|
| "advancing the reference past the header information"<br><br>Alternatively:<br>    "either (1) stripping off or deleting a header; or (2) advancing a pointer past the header information" | Plain and ordinary meaning |

(Dkt. No. 73, Ex. A, at 7; Dkt. No. 76, at 12; Dkt. No. 78, at 17; Dkt. No. 81, at 10; *see* Dkt. No. 94, Ex. A, at 18.)  The parties submit that these terms appear in Claim 24 of the '683 Patent. (Dkt. No. 73, Ex. A, at 7; Dkt. No. 76, at 12; Dkt. No. 78, at 17; Dkt. No. 94, Ex. A, at 18–19.)

   (1)  The Parties' Positions

   Plaintiff argues that construction of this term is necessary because "'removing,' as used in this term, does not mean the same thing to a lay person as it does to a person of ordinary skill in the art, as can be clearly seen in the Demultiplexing Patents."  (Dkt. No. 76, at 12.)

   Defendant responds that "[t]he inventor did not act as his own lexicographer to redefine this basic word," and "the extrinsic evidence shows that one of ordinary skill in the art *would* understand 'removing' to be its plain and ordinary meaning – *e.g.,* stripping off or deleting a header."  (Dkt. No. 78, at 17 (citation omitted).)  Defendant also argues that "[h]ad the Applicant intended to claim advancing references past headers, he could have done so," "[f]or instance, the Applicant addressed 'references' in other claims."  (Dkt. No. 78, at 18.)

   Plaintiff replies that "PAN ignores realities of computer programming in order to arrive at a result that is inconsistent with the way in which headers and data are passed between layers

in any conventional networking stack." (Dkt. No. 81, at 8.)  Plaintiff also proposes the following

alternative construction: "either (1) stripping off or deleting a header; or (2) advancing a pointer

past the header information."  (*Id.*, at 10.)

(2)  Analysis

Claim 24 of the '683 Patent recites (emphasis added):

24.  A non-transitory, computer-readable medium comprising program
instructions executable by a computer system to:
        identify information from different headers associated with various layers
of a received packet of a message;
        create, using the identified information, one or more data structures that
reference a sequence of routines;
        store the one or more data structures; and
        process subsequent packets of the message using the sequence of routines
referenced by the one or more data structures, including by *removing an
outermost header* of a given packet using a first routine corresponding to a
protocol in a first layer and by *removing the resulting outermost header* using a
second routine corresponding to a different protocol in a different layer.

Plaintiff has cited the following disclosure that appears at the end of the written

description:

Although the conversion system has been described in terms of various
embodiments, the invention is not limited to these embodiments.  Modification
within the spirit of the invention will be apparent to those skilled in the art.  For
example, a conversion routine may be used for routing a message and may
perform no conversion of the message.  Also, a reference to a single copy of the
message can be passed to each conversion routine or demuxkey routine.  These
routines can *advance the reference past the header information for the protocol so
that the reference is positioned at the next header*.  After the demux process, *the
reference can be reset to point to the first header for processing by the conversion
routines* in sequence.

'683 Patent at 14:4–16 (emphasis added).  Although this disclosure refers to advancing and

resetting a reference, this disclosure does not use the term "removing" and does not amount to a

lexicography as to that term.  *See, e.g., Renishaw*, 158 F.3d at 1249 ("The patentee's

lexicography must, of course, appear with reasonable clarity, deliberateness, and precision before

- 25 -

it can affect the claim.") (citation and internal quotation marks omitted); *see also Intellicall*, 952

F.2d at 1388.  Indeed, the specification does not appear to include any relevant usage of

"removing" outside of the claims.

Of note, however, Claims 16 and 20 of the '683 Patent recite (emphasis added):

16.  A first apparatus configured to receive data from a second apparatus, the first apparatus comprising:
    a processing unit; and
    memory storing instructions that are executable by the processing unit to:
        obtain and analyze information from a received packet of a message;
        identify an address based on the obtained information, wherein the address references a list of routines;
        create one or more data structures that indicate state information corresponding to routines in the list;
        store the one or more data structures; and
        process subsequent packets of the message using the state information, including state information that corresponds to *a particular routine that is used to execute a protocol to convert packets from an input format to an output format*, wherein the particular routine is not executable to convert packets having the output format.

* * *

20.  The first apparatus of claim 16, wherein the particular routine is executable to *convert packets by removing an outermost header of the packets*.

Because Claim 20 recites "removing" with reference to "convert[ing]" from an input

format to an output format (as recited in Claim 16), the "convert[ing]" in Claim 20 can be fairly

read as implying that the "removing" involves modifying the packets rather than merely moving

a reference.  These claims thus provide context that further weighs against Plaintiff's suggestion

that the above-reproduced disclosure in the specification should be applied to the term

"removing."  *See Phillips*, 415 F.3d at 1314 ("Other claims of the patent in question, both

asserted and unasserted, can also be valuable sources of enlightenment as to the meaning of a claim term.").

Also, as Defendant has noted, Plaintiff's proposal appears to read out the "outermost" limitation. Indeed, the limitation of "removing the resulting outermost header" in the claim here at issue appears to assume that the previously outermost header is no longer present (such that the removal of the original "outermost" header results in there being a new "outermost" header). This understanding is also consistent with extrinsic evidence submitted by Defendant. (*See* Dkt. No. 91, Ex. H, Tanenbaum, *Computer Networks* 20 (3d. ed. 1996) ("At the receiving machine the message moves upward, from layer to layer, with headers being stripped off as it progresses. None of the headers for layers below $n$ are passed up to layer $n$.").) Finally, as Defendant has argued, Plaintiff's proposal of "the reference" would tend to confuse rather than clarify because the claim contains no antecedent for a "reference."

Based on all of the foregoing, Plaintiff's proposal lacks sufficient support for altering the otherwise readily apparent meaning of "removing," particularly in light of the context provided by above-reproduced Claims 16 and 20 of the '683 Patent. Further, Plaintiff has not submitted any evidence to support its contention that Defendant's proposed interpretation is inconsistent with "the technical realities of network processing." (Dkt. No. 81, at 8; *see id.* at 8–9.)[12] Instead, the above-noted extrinsic evidence submitted by Defendant is unrebutted. To whatever extent the Court can consider the demonstrative arguments presented by Plaintiff's counsel at the February 23, 2018 hearing as to how a person of ordinary skill in the art would understand the

---

[12] The only evidence, intrinsic or extrinsic, cited by Plaintiff as to this disputed term is the above-reproduced portion of the specification ('683 Patent at 14:4–16). (*See* Dkt. No. 76 at 12–13; *see also* Dkt. No. 81 at 8–10.) Indeed, the only exhibits that Plaintiff has submitted with its briefing are the patents-in-suit. (*See* Dkt. Nos. 76 & 81.)

word "removing" in this context,[13] those demonstrative arguments are unpersuasive.  Finally,

Plaintiff's counsel's citation of the above-reproduced portion of the specification during those

demonstrative arguments is unavailing.  As noted above, that disclosure does not refer to

"removing,"[14] and Plaintiff has not shown any inconsistency between that disclosure and the

extrinsic evidence submitted by Defendant.  *See* '683 Patent at 14:4–16; *see, e.g., PPC*

*Broadband, Inc. v. Corning Optical Commc'ns RF, LLC*, 815 F.3d 747, 755 (Fed. Cir. 2016) ("It

is not necessary that each claim read on every embodiment.") (citation and internal quotation

marks omitted).

     The Court therefore hereby expressly rejects Plaintiff's proposed interpretation, in

particular as to encompassing moving a "reference" or "pointer."  No further construction is

necessary.  *See U.S. Surgical Corp. v. Ethicon, Inc.*, 103 F.3d 1554, 1568 (Fed. Cir. 1997)

("Claim construction is a matter of resolution of disputed meanings and technical scope, to

clarify and when necessary to explain what the patentee covered by the claims, for use in the

determination of infringement.  It is not an obligatory exercise in redundancy."); *see also O2*

*Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351, 1362 (Fed. Cir. 2008)

("[D]istrict courts are not (and should not be) required to construe every limitation present in a

patent's asserted claims."); *Finjan, Inc. v. Secure Computing Corp.*, 626 F.3d 1197, 1207 (Fed.

Cir. 2010) ("Unlike *O2 Micro*, where the court failed to resolve the parties' quarrel, the district

---

[13] *See Elbit Sys. of Am., LLC v. Thales Visionix, Inc.*, --- F.3d ----, No. 2017-1355, 2018 WL 717187, at *4 (Fed. Cir. Feb. 6, 2018) ("'[a]ttorney argument is not evidence' and cannot rebut other admitted evidence") (quoting *Icon Health & Fitness, Inc. v. Strava, Inc.*, 849 F.3d 1034, 1043 (Fed. Cir. 2017)).

[14] The absence of any apparent lexicography to support Plaintiff's position as to "removing" is particularly notable when contrasted with the presence of a lexicography as to the term "message," discussed above.

court rejected Defendants' construction."); *ActiveVideo Networks, Inc. v. Verizon Commcn's, Inc.*, 694 F.3d 1312, 1326 (Fed. Cir. 2012); *Summit 6, LLC v. Samsung Elecs. Co., Ltd.*, 802 F.3d 1283, 1291 (Fed. Cir. 2015).

The Court accordingly hereby construes **"removing [an / the resulting] outermost header"** to have its **plain meaning**.

### F. "resource"

| Plaintiff's Proposed Construction | Defendant's Proposed Construction |
|---|---|
| Plain and ordinary meaning | "data object containing code that: (1) is an application, (2) is an applet, or (3) can be used to build an application or applet" |

(Dkt. No. 73, Ex. A, at 9; Dkt. No. 76, at 13; Dkt. No. 78, at 19.)  The parties submit that this term appears in Claims 1, 9–11, 13, 19, and 20 of the '740 Patent.  (*See* Dkt. No. 73, Ex. A, at 9; Dkt. No. 76, at 13; Dkt. No. 78, at 19.)

In *Trend Micro*, the Court construed "resource" in the '740 Patent to mean "data object containing code that: (1) is an application, (2) is an applet, or (3) can be used to build an application or applet," as Defendant has proposed here. *Trend Micro* at 37.

After the close of briefing in the present case, the parties reached agreement that this term should be construed to mean "a data object containing code, where that code: (1) is an application, (2) is an applet, or (3) can be used to build an application or applet."

In accordance with this agreement between the parties, the Court hereby construes **"resource"** to mean **"a data object containing code, where that code: (1) is an application, (2) is an applet, or (3) can be used to build an application or applet."**

## V.  CONCLUSION

The Court adopts the constructions set forth in this opinion for the disputed terms of the patents-in-suit, and in reaching conclusions the Court has considered extrinsic evidence.  The Court's constructions thus include subsidiary findings of fact based upon the extrinsic evidence presented by the parties in these claim construction proceedings.  *See Teva*, 135 S. Ct. at 841.

The parties are ordered that they may not refer, directly or indirectly, to each other's claim construction positions in the presence of the jury.  Likewise, the parties are ordered to refrain from mentioning any portion of this opinion, other than the actual definitions adopted by the Court, in the presence of the jury.  Any reference to claim construction proceedings is limited to informing the jury of the definitions adopted by the Court.

Within thirty (30) days of the issuance of this Memorandum Opinion and Order, the parties are hereby **ORDERED**, in good faith, to mediate this case with the mediator agreed upon by the parties.  As a part of such mediation, each party shall appear by counsel and by at least one corporate officer possessing sufficient authority and control to unilaterally make binding decisions for the corporation adequate to address any good faith offer or counteroffer of settlement that might arise during such mediation.  Failure to do so shall be deemed by the Court as a failure to mediate in good faith and may subject that party to such sanctions as the Court deems appropriate.  No participant shall leave the mediation without the approval of the mediator.

**So ORDERED and SIGNED this 6th day of March, 2018.**

RODNEY  GILSTRAP
UNITED STATES DISTRICT JUDGE